19-0147 Ledbetter Trucking & Excavating, Inc, Appellant James Zamuda v. Brian Furr, Christopher Reynolds, and Chris's Concrete Service, Appalachia. By William Rector. Mr. Zamuda. May it please the Court, Counsel, good morning. My name is James Zamuda and I'm the attorney for the Plaintiff Appellant, Ledbetter Trucking & Excavating, which I will sometimes reference as LTE for brevity. The horse is out of the barn and there is no way to put the horse back into the barn. This was the analogy and the apparent standard the Circuit Court used in denying the preliminary injunction requested by LTE. The Circuit Court's approach raises a number of questions. What is the horse? What is the barn? The parties in this Court are left wondering. One explanation is the barn represents the stable of LTE customers before the Furr defendants engaged in their wrongful conduct. And the horse represents the customers who left the barn because of the Furr defendants' wrongful conduct. This Court may or must actually determine how, if at all, this analogy fits the legal standard the Circuit Court was required to apply in deciding whether a preliminary injunction should be granted or denied. Simply put, it does not fit. Rather, the Circuit Court manufactured its own standard in denying LTE's request of preliminary injunctive relief. The Circuit Court, I believe, clearly misconstrued the purpose of a preliminary injunction, which is not a make-whole remedy. The purpose of a preliminary injunction, as this Court is aware, is to stop, essentially, the bleeding, to stop the ongoing wrongful conduct until the merits of the case have been determined at trial. Yet the Circuit Court determined, for unknown reasons, the requested relief would not return the wrongfully solicited customers to LTE. Clearly, this is not the legal standard for denying a preliminary injunction, and the Circuit Court's creation of its own standard, I submit, constitutes reversible error. The Circuit Court also committed error by unequivocally stating there is no status quo that we can go back to. Whether a status quo exists is not and was not a contested issue in the case. I have been unable to find any reported Illinois case in which a court has found the lack of a status quo. And I believe the reason why is clear, because a status quo exists in every single case. Every case has a last, actual, peaceable, uncontested status preceding the actual controversy. And I think this concept was lost on the Circuit Court, and instead the Circuit Court focused on, wrongfully, a make-all, or what it considered to be a make-all remedy. In this case, the last, actual, peaceable, uncontested status preceding the controversy was before deferred defendants wrongfully solicited LTE's customers, and before deferred defendants began doing business with clientless customers. Can I just ask you this? Yes. How do you do that? I mean, even with an injunction, let's say you've got a former customer, and they're already, recently filed a suit because your former customer is now doing business with the defendant. Yes. How do you force that former, the former customer says, I like doing business with the defendant, and how do you order that customer not to do business with the defendant? Well, I think the court very clearly can do that, and that levels the playing field. In other words, the customer can decide on their own, do I still do business with LTE, or do I go back to doing business with LTE, or do I do business with some third party because I am foreclosed from doing business with the first party? But let's just say, so I feel like the way a defendant follows my driveway or my parking lot, and it says, and the court says, so this is non-carny, you can't hire a defendant to do your driveway. Now, in essence, what they're doing is telling the defendant, I don't care if they do call you to do the driveway, you can't do it, right? But as the court is aware, that happens frequently in the law. In other words, we have situations where an employee, not our situation here, but an employee signs a restrictive covenant prohibiting them from doing business with a customer of its employer, we'll say, and that covenant can restrict that individual from doing business with any certain geographic location with certain individuals. But if there's a legal remedy, in other words, well, you go back and say, gee, let's say you win on the merits, and then you go back and you say, well, the defendant followed my former customer's driveway 18 times, and had I done it, I'd have made $1,500 or whatever each time I did it. So by virtue of him following that guy's driveway during the course of the events in court one, I'm out $1,800. That's part of my damages. Isn't that a legal remedy? But the protectable interest here, I don't disagree with that, assuming you can calculate those dollar amounts, but the protectable interest here is the relationship with those individuals, with those customers. And that's what LTE was buying when it purchased the business from Miller's Hauling. It was buying relationships. It was buying an ongoing business. And the interference with those relationships is what can be stopped pending a trial on the merits. So that's what I consider to be the protectable interest that is not subject to being cured with damages, and that is this relationship and the goodwill that LTE is developing and attempting to develop. And again, the injunctive relief can put LTE back on a level playing field with the deferred defendants by stopping that wrongful conduct pending a trial on the merits. I'm sorry, go ahead. Mr. Furr had the list on his phone. It wasn't a secret list. It hadn't been protected. And you didn't have an arrangement with him to prevent him from using it. Is that correct? He did have, to my understanding, a version of the list on his phone. And the reason why he did was because of his employment with LTE. In other words, he needed... Oh, it was because of his employment with Miller. Well, both. In other words, the only reason he had that customer list at all is because, first, of his employment with Miller's Hauling, for which he needed that list to do business of that company, and, second, his employment with LTE. Those are the only reasons why he had that particular list. But for those employment relationships, he would not have had that information. There was no restrictive covenant for the employee. There was no employment contract, was there? No employment contract, correct. I mean, because a lot of what you're saying in your brief looks like the typical lawsuit when there was an employment contract. Is that right? That is true, but what we do have here... But what we do have is the duty of loyalty. And each employee owes that duty of loyalty to his or her employer. And that duty requires that particular employee not to set up a competing business and attempt to steal customers while employed by their employer. I mean, there's some parts of your brief that appears to me to... It's almost like saying nobody needs an employment contract. Those are negotiated. They're contractual relationships. You don't have one here. But you're trying to enforce, basically, the non-existent employment contract. I know that you used it. Like in your argument, for example, that there's the duty of loyalty. Well, there's an overreaching public policy in the United States and in Illinois that there's a decreement of employment. Decreement to be hired, right? To work. Subject to certain restrictions. And, again, if we ignore the duty of loyalty, I understand that. And here, Mr. Furr had an option. What he could have done is he could have terminated his employment and been honest and said, Look, I want to start a competing business. I'm going to cease my employment with you and go and do that on my own. That's not what he did. What he did is he used his employment as an opportunity to cultivate those relationships, which we think are entitled to protection, while he was still employed by LTE. That is the wrong. I'm still having a problem with it. I mean, he was cultivating the relationships anyway. It was his job. He was cultivating those relationships for his employer, for LTE, not for his own personal benefit and that of Mr. Reynolds. Okay, just one more question about the protectable interest. Isn't that possible for somebody who does the snow plowing as a business to just drive around town and see places that need plowing and stuff and say, Do you need somebody to plow your lawn? Sure, that's absolutely possible, but what that individual doesn't have is the opportunity to lock in the door because of an existing relationship. In other words, the relationships matter, and that's what we're saying here is that those relationships and that goodwill that have been developed by Miller's Hauling, which was purchased by LTE, matters. I understand that, but the requirement of a protectable interest seems to be something broader than just a customer list that you could compile by going to a phone book or driving around, that just the subject matter of this doesn't seem to rise to a protectable interest. Well, and again, I use other examples in the world to answer that question, and like Apple customers or other customers in the world that have particular relationships with a company, those companies value those relationships, and those relationships have value. So I think the concept is most clearly shown through what Justice Carter was asking earlier, and that is let's assume that there was an employment agreement that contained restrictive covenants that were enforceable under the law and had a reasonable scope, both in time and in geographic scope. Those sorts of covenants are enforceable. I assume you can agree to them. Well, that is true, and yet, again, we can't, I don't think, forget the duty of loyalty, because that has to mean something, and in the context of this case, I believe very clearly what that means is that while you're employed by an employer, you should not be allowed to take the relationships that you're supposed to be managing and cultivating on behalf of your employer for your own opportunity. This is a case where it would be possible for someone even to have an employment contract, and that we're going to the protectable interest. Is this the kind of case where an employer could even have a valid agreement? I believe so, and I believe that's done routinely. In other words, customers... You know, the law defines, the law has factors. Is this the kind of situation? I believe so. While this is primarily a service business, we have in the world restrictive covenants that apply to salespeople. Do you have an example of a restrictive covenant in this kind of employment? In the service industry? No, in this kind of one. An example of this kind of situation in particular is a case where you have that kind of employment agreement with a restrictive clause. And just so I understand the question, when you say in this case, do you mean in an excavating, snow plowing type business? I don't know of any particular company, just because I'm not familiar, but again, I think it's no different than a sales job situation where an individual is a sales representative for a particular company, whether that company sells widgets or services, and they have a restrictive covenant through their employment agreement with that employer. Just seeing your example, it really matters what the widgets are. It matters what you're restricting. It matters what the topic is. Because as you know, there are a lot of different kinds of work out there where you cannot have a valid employment contract containing restrictions. And I'm just not… Unlike restrictive covenants. And I'm just… It's not true. In the law, there are a lot of businesses where you can't enter into with your employee a valid employment contract with a restrictive covenant because it's not the kind of work, that kind of business, where you could have a protectable interest. Well, I know that's true with respect to lawyers, for example. But that's a matter of public policy. Lawyers can't. Correct. But I think… Other professions can't, but lawyers can as a matter of public policy. I think those examples are very limited in scope. And again, here… Last two minutes. Here, I think there's no way to distinguish from a salesperson, which essentially is what Mr. Kerr was doing in large part. He was selling business to the customers and maintaining relationships. It's no different than a salesperson who is selling widgets. Service or widgets. The idea is furthering those customer relationships on behalf of your employer. And that's the protectable interest on the part of the employer, whether it's widgets or services. Thank you. Mr. Rector. May it please the Court. Counsel, Bill Rector, attorney on behalf of the FLEs, Brian Furr, who worked for years for Miller Excavating and Briefing for LTE, Chris Reynolds, and Chris's Concrete Service, which was a customer of Miller. I want to start with framing the issue, if I may, because the… Your argument.  Thank you, Justice. There's been a lot of time spent in the briefing and here at argument discussing and criticizing the way the circuit court articulated its rationale. But we contend that what's under review, of course, is the judgment of the circuit court, not the rationale under the Supreme Court's decision in re a state of funk. A reviewing court may sustain the decision of a lower court on any grounds which are called for by the record, regardless of the reasoning. So it's the bottom line that is at issue. And in looking at that decision of the circuit court, this court of course applies an abuse of discretion standard. And so the question for this court we submit is whether the circuit court abused its discretion in its decision that LTE failed to present the evidence required to get a preliminary injunction stopping Mr. Furr, Mr. Reynolds, and Chris's concrete from doing business with certain entities. So you like the conclusion but not the rationale. I don't have a problem with the rationale, but I think we want to move beyond the words that were used and whether it was artfully articulated or not is not the issue today In other words, the conclusion is what's up here, not whether or not the rationale was artful. Yes, Your Honor. Yes, Justice. There is no restricted covenant at issue. And there could have been, as one of the questions indicated, but it's in the record that Mr. Furr refused to sign a non-compete. And the abuse of discretion standard, under that standard there was plenty of evidence submitted at the preliminary injunction hearing which shows that there was no protectable interest. And Justice McDade's questions, I think, did have that. What LTE is claiming is that this list of hauling and excavating customers and snow plowing customers, which they contend was attached to an asset purchase agreement with Miller, to which Furr, Reynolds, Chris's Concrete were not a part of it, they're not a party to that asset purchase agreement, that that list is a trade secret and that they have a protectable interest in doing business for those entities without any competition from Reynolds, Furr, or Chris's Concrete. Now, Chris's Concrete, by the way, is on that list. I mean, what they're seeking is an injunction stopping Chris's Concrete essentially from doing its own hauling and excavating. And I think it's important to know that the standard of getting a preliminary injunction is heightened. It is an extraordinary remedy. It does require that an emergency exists, and the party seeking it must clearly show a need to preserve the status quo. And no adequate remedy at law. Right, and no adequate remedy at law. And that it will suffer irreparable harm if an injunction does not issue. Let me, let me. We're not here talking about the merits, but preliminary injunction aside, would you agree that if Mr. Zmuda and his client win on the merits of decisions from then down the road, that they can cause any defendant found liable to them to basically to disgorge all those profits that Mr. Zmuda's client would have made? That would be the remedy, right? I lost these profits. And so these defendants, if they keep working, would be in essence working for free in essence for Mr. Zmuda's client for the next few years, however long it takes to get resolved. Assuming, I'm just saying this hypothetical, assuming that Mr. Zmuda would be successful on the merits down the road. LGE has claimed that they have that remedy, that they can get damages. You know, we of course dispute liability or that they'll be able to prove. We dispute liability, but they're claiming they can get the damages. If in that event, then your clients would end up pulling out some money and in effect disgorging the profits they made and whatever the net profit the client could show he would have made had he performed this work. Well, it would have to prove those damages. I got it. Assuming they prove it. Okay. Well, your client didn't work for free, did they? No, the client... They made some money. Right. These entities are, and some of these entities, Riverstone and I think Quad City Spas have utilized both LTE and for to do hauling and excavating. And, you know, as the questions indicate, taking advantage of the market. The customer, it benefits customers to have a choice, to have a free market, to have competition. And here, without a restrictive covenant at all, they're seeking to stop that competition. And we contend that there's just no basis to do that. And so that a preliminary injunction was not warranted and the court was well within its discretion in denying it. As to the duty of loyalty, which is argued here and is argued in the briefing, under the Manger decision, which is cited at page 12 of our briefing, it's okay for an employee to take preliminary steps to set up a business. And we contend that that's what the evidence supports. They contend that there's unequivocal evidence of solicitation. We disagree with that. Ferb said that people came to him. Reynolds said that people came to them. You know, when Ledbetter bought Miller, people asked Ferb, what are you going to do? You've been working for Miller for a long time. And he said, come spring? I don't know. And so we contend that there was no breach of loyalty and also that even if there was, and we contend there was not, it wouldn't get the LTE to the point where a preliminary injunction is warranted, certainly where the court abused its discretion in denying it, because there's no protectable interest that's been demonstrated. This information, the list of entities that did snow plowing and hauling and excavating with Miller, Ledbetter didn't do hauling and excavating with them. So there's no near permanent relationship. And the information, this was known to Ledbetter at the time, the information was contained on employees' cell phones. It was on Ferb's cell phone because it was worked for Miller, as was indicated previously. The information, initially Miller was sued by Ledbetter. And the information was placed in the public court file. So it's not, it never was secret. It never was a protectable interest. And certainly it is not after being placed in the court file. Mr. Rector? Yes, ma'am. Under the common law in this area, there was, these kinds of restrictions were disfavored because they were considered to be in restraint of trade. And that made the inquiry about the protectable interest critical to the determination of whether there was something here that was protected. And so there were a number of standards that were developed to determine how much protection there had been of the secret. It was the nature of the secret. And I guess my question is, to what extent was that kind of body of law incorporated under the jurisprudence of the statute, the Trade Secrets Act? Are those still valid considerations for us when we're looking at this? I believe so. That there was, that the factors that the courts look at is not one factor, but the whole picture as to what was done to protect this information. And here, I don't think you have facts that show that steps were taken to protect the information because, to my better knowledge, it was on employees' cell phones. Klarkowski, another defendant, testified that snow plowing was known to him by heart. And, of course, it was placed in the public court file. It should also be noted that the procedural history of this case is that the circuit court initially granted a temporary restraining order based on the pleadings containing these facts. This court reversed, and it's our contention that those facts really haven't changed with respect to whether there's a protectable interest under that analysis. Okay, well, I ask because it's true that we don't resolve the merits, but one of the issues is whether there's a likelihood of success, so we have to look at the merits for that reason. Thank you. Thank you. I would simply conclude by reemphasizing that the law favors competition. It favors fair competition. Fair competition. And there aren't any facts, or rather the circuit court had enough facts to exercise its discretion and decide that the preliminary injunction should not be issued. Competition in the free market benefits the public. The restriction should be the exception. There is no restrictive covenant here. This is an attempt to put a competitor out of business, and the trial court did not abuse its discretion in denying LTE's attempt to restrict the competition by stopping Miller's former employee and Miller's former customer from entering the hauling and excavating business, and the trial court's decision to be affirmed. Unless the court has any more questions, that's my argument. It looks like there are none. Thank you. Mr. Zimutis in rebuttal. Thank you very briefly. Let me begin at the point at the end. Mr. Rector indicated that this lawsuit by LTE is an attempt to put a competitor out of business. That is incorrect. We're not attempting to put this client out of business. What we're trying to do is to protect fair competition and to prohibit unfair competition. Let me ask you this, because I used to have a business. I was a real lawyer at one time, and so I'm sympathetic that people attempt to do that. However, let's talk about the standard review that we're stuck with here, and that is abuse of discretion. The Supreme Court tells us, well, there's abuse of discretion when no reasonable person could agree with the judge's ruling. Well, under the applicable standard and the facts of the case, I submit that the circuit court did abuse its discretion. I think Mr. Rector indicated that the rationale does not matter. I think the rationale does very much matter, and the standard seemingly adopted by the circuit court is quite frankly just wrong. And another point which I think is important to remember is, and Justice Smith may have been asking questions about discouraging profits, what happens when this case ends? Those relationships are still being harmed in the interim, and they're harmed continuously at the end and beyond the end if that conduct is not restrained. So, again, the relationships and the cultivation of those customers and that customer base over years is what has value. Well, if you won on the merits... Yes. ...would there be anything to stop you from at that point applying for, submitting one of the merits, applying to the circuit court for a permanent injunction? Well, that will be part of the relief request of the trial, most certainly, absolutely. And another point that I wanted to address with respect to Mr. Rector's argument is his statement that the duty of loyalty does not prohibit preliminary steps on the part of an employee to essentially begin competing. I don't disagree that's the law, and if, for example, Mr. Furr had simply formed a corporation for future purposes to do business at some point in the future, I don't think anything is wrong with that. But what we have, and this is addressed at pages 32 and 33 of our initial brief, we have text messages between Mr. Furr and Mr. Reynolds, and I'm reading from page 32 of our brief where I'm quoting these text messages, and Mr. Furr is saying to Mr. Reynolds, I'm ready to be done with John, meaning Mr. Ledbetter, but still got to pay bills through winter, LOL. Mr. Reynolds responds, I know, buddy. Mr. Reynolds says, it will be all good soon. Mr. Reynolds then says, just try to build clients. That is the conduct that we're seeking to enjoy because an opportunity was taken while Mr. Furr was still employed by LTE and very clearly owed this duty of loyalty, and that is way beyond preliminary steps to which Mr. Rector was referring. So that is clearly something that's an undisputed fact and a basis for injunctive relief, and I think is a basis for determining the Circuit Court of Abuse's discretion. With that, unless there are any remaining questions, I will conclude my remarks. No questions? Thank you. Thank you both for your arguments here this morning. This matter will be taken under advisement. Written disposition will be issued.